FULKERSON *et al.*, *Appellants*, v. SAPPINGTON *et al.*

DIVISION TWO.

1. **Fraudulent Conveyance : EVIDENCE.** In a suit to set aside a
   conveyance of land because made in fraud of creditors, it appeared
   that defendant, who was county treasurer, purchased the land for
   $2,100 and paid for it with the public funds, but took the title in
   the name of a third person ; that after two years, at his request,
   the land was conveyed to one M., who likewise held it in secret
   trust, having paid nothing for it ; that the debtor afterwards
   resigned his position as county treasurer, being a defaulter to the
   extent of $6,000, and hopelessly insolvent ; that among his debts
   was a note for $3,000 to his bankers, one of whom was M.; that
   his surety thereon was desirous of being released ; that the defend-
   ant persuaded his brother to become his surety, and to indemnify
   him obtained an agreement from M. to convey the land to him
   upon the payment of the note, and reciting that the price of the
   same at $1,500 was included therein ; that defendant to further
   indemnify his brother executed a mortgage on his homestead ;
   that his brother was sheriff of the county and had heard rumors of
   defendant's condition, but made no inquiry ; that he examined the
   title and thought he would be safe. The plaintiffs claim under
   one who bought the land at execution sale under a judgment in
   favor of the county against defendant and his bondsmen. *Held*,
   reversing the decree of the trial court, that the conveyance to
   defendant's brother was made in fraud of creditors, and that the
   title to the property should be divested out of respondents and
   vested in the appellants.

2. **Practice in Supreme Court : REVIEWING FINDING IN EQUITY
   CASE.** Where the finding of the trial court in an equity case is
   clearly erroneous, the supreme court will not defer to it.

*Appeal from Saline Circuit Court.*—HON. RICHARD
FIELD, Judge.

AFFIRMED.

THIS is a suit in equity by appellants against
respondents, to obtain a decree of title to a tract of
about ten acres of land near Marshall, in Saline county,
Missouri. The plaintiffs are purchasers of the title of

Barnabas Sappington under execution, against defendant, Frank Sappington, who claims by virtue of certain conveyances charged by plaintiffs to be fraudulent as against them.

From 1868 to 1874, Barnabas Sappington was the treasurer of Saline county, Missouri. Among others, Frederick Fulkerson was one of his bondsmen. The appellants are the heirs at law of Frederick Fulkerson. Frank Sappington is a brother of Barnabas Sappington, and was sheriff of Saline county in 1873 and 1874. In 1871, Barnabas Sappington purchased of John W. Bryant the ten-acre tract of land in controversy in this case and another tract of nine and one-half acres adjoining it. He paid for the lands by check for $2,100 on Cordell & Montague, bankers in Marshall, with whom he kept his account as county treasurer. The evidence clearly shows that he had no money in said bank at the time other than county funds. He caused the title to the land in suit to be conveyed by Bryant to one James H. Eakin in September, 1871. Eakin held the title, in secret trust for Barnabas, until February, 1873, when, at the request of Barnabas, he conveyed it to E. D. Montague, one of the firm of Cordell & Montague.

In the fall of 1873, it was discovered that Barnabas Sappington was a defaulter in his office of treasurer. It seems to have become generally known, as he says, he resigned because he was behind in his accounts and could not make up the amount of his shortage, and the *people wanted a new treasurer.* He tendered his resignation on the twenty-third day of December, 1873. David Landen was appointed his successor, and the settlement of Barnabas set for hearing in January, 1874. On this final settlement it appeared he owed the county nearly $6,000.

On December 10, 1873, Montague and wife executed to Frank Sappington the following contract for a deed to the lands in suit :

Fulkerson v. Sappington.

"Know all men by these presents, that I, E. D. Montague, of the county of Saline, state of Missouri, have this day sold to F. M. Sappington the following described real estate situated in Saline county, Missouri, to-wit: The east half of the southwest quarter of the southeast quarter of section 11, township 50, of range 21, to which said land I agree and bind myself to make a deed with covenants of special warranty, conveying said land to F. M. Sappington, or to whom he may direct, on the following condition, to-wit: That B. Sappington and F. M. Sappington have this day executed to Cordell & Montague their joint note for the sum of $3,000, dated December 10, 1873, due January 1, 1876, bearing ten-per-cent. per annum interest from date, which said note embraces the consideration for said land, to-wit, $1,500. Now, if said note shall be paid when due then this obligation to be in full force ; otherwise to be void. Witness my hand and seal this tenth day of December, 1873.

"[ Seal.]                    E. D. MONTAGUE, .
"[Seal.]                    MARY N. MONTAGUE."

Which was acknowledged on the twelfth and recorded on the thirteenth of December, 1873.

Afterwards on the sixth of March, 1879, Montague and wife made a "special warranty" deed to Frank Sappington to the said lands, and it was recorded in recorder's office in Saline county, March 7, 1879. It is this contract and deed that plaintiffs charge are fraudulent, and seek to have them declared void.

The petition in this case was filed March 17, 1887, and charges that Barnabas was county treasurer ; that Frederick Fulkerson and others were his bondsmen ; that he defaulted and became and was wholly insolvent ; that he was indebted to the county in the sum of $6,000 in the fall of 1873 ; that being so indebted said Barnabas and Frank Sappington and E. D. Montague entered into a fraudulent combination and arrangement,

whereby the land in suit was to be conveyed to Frank Sappington by Montague upon the payment of a certain $3,000 note that day executed to Cordell & Montague by Barney and Frank Sappington.

The petition also sets forth, that at the same time Barney secured Frank against loss as security on said note, by a deed of trust on his other place of nine and one-half acres. The petition charges this contract and subsequent deed to have been voluntary and fraudulent; made to defeat the creditors of Barney, especially Saline county. Charges that judgments were obtained on his defaults to the county; the sale of this land under said judgments and the purchase by Frederick M. Fulkerson, the ancestor of plaintiffs; that at the time of the execution of the contract the lands were vacant and unimproved. The prayer is for cancellation of deed of Frank Sappington and decree of title in the plaintiffs.

The answer admits the relations of the parties; that Barney was treasurer and that Frederick Fulkerson was surety on his bond; that he was indebted as charged in petition. Denied all fraud. Set up the purchase of Bryant, the execution of the deed to Eakin, the payment of the money by Barney, and then states that Barney sold and at his request Eakin conveyed the land to Montague; that afterwards Barnabas Sappington in November, 1873, became indebted to Cordell & Montague in the sum of $3,000, with Isaac Elzea as his surety; that Elzea insisted on being released; and the *said Montague was not able to pay the same*, and, for the purpose of securing Cordell & Montague and releasing Elzea, Barnabas executed a new note for $3,000, with Frank as surety; and that at this time Frank bought the land in question from Montague and it was agreed between Frank and Barney and Montague that Frank should pay $1,500 on the note and that Barney should release Montague from the payment to him of that amount for the land, and that upon the

payment of the $3,000 in full Montague should make Frank a deed for the land; that Frank had paid the note and Montague on March 6, 1879, made him the deed and pleaded the statute of limitations.

Plaintiffs to the statute of limitations replied an estoppel.

Barnabas Sappington, one of the defendants, testified that he bought the land in question from John W. Bryant, in September, 1871, together with the northwest quarter of the southwest quarter of the southeast quarter of the same section, through Eakin as his agent; and it was conveyed by Bryant to Eakin, and the title remained so in Eakin until February 12, 1873, in trust for him, Barney Sappington, without any evidence, from Eakin to said Sappington, of the payment of the purchase money by said Sappington or of the trust in Eakin; that the land was paid for by the witness, Barney Sappington, at that time with money which belonged to Saline county and was in his custody as treasurer of said county, by means of a check, for $2,100 drawn by him, about the thirtieth of September, 1871, on the banking house of Cordell & Montague at Marshall, Missouri, where he had a large amount of county money deposited to his individual credit, which check was paid, by the bank, on the tenth of October, 1871, out of the county money so to his, Barney Sappington, credit, and charged to his account; that he had no other money or credit in the bank at the time, and that the money so paid for the land has never been paid back or made good to the county, by him; but was afterward paid by the sureties on his official bonds as treasurer on judgments recovered against them at the suit of the county.

That he bought the land from Bryant, through Eakin, and took the deed in Eakin's name, because he thought he could buy it cheaper in that way; that Eakin so held the title from September 30, 1871, till

February 12, 1873, when he, at the request of the witness, conveyed it to Montague ; that, prior to becoming treasurer, he was engaged in mercantile business, in Marshall, in partnership with his brother, Frank M. Sappington ; that just before he became treasurer they closed out their business and exchanged their stock of goods for a tract of land on Blackwater; that his, Barney, entire interest in the stock and business, went into the land, in which he, thereby, acquired a one-third interest, which was afterwards sold under executions issued on the judgments recovered by Saline county, against him and his sureties on his official bond as treasurer; that he had no other property except the nine and one-half acres on which he lived and one-third interest in two lots in Marshall for about $400; which were sold under the same execution ; that, after he became treasurer, he had no other income, or means of support, except his salary as treasurer ; which he thought may have been as much as $700 per year, not more; that he had a family to support, and his expenses were quite equal to his salary.

That he deposited the county funds in Cordell & Montague's bank in his own name, to his individual credit, not as treasurer ; and never had an account there otherwise ; that he paid for the land in question by his check for $2,100 on Cordell & Montague's bank, drawn against his account with the bank ; and it was paid by the bank and charged to his account ; that he did not know that he had any money to his credit in the bank, at the time, except that of the county ; and supposed that he never had refunded or made good the money paid on that check to the county, and that it formed a part of his final deficit, at the time of his resignation ; that Eakin had conveyed the land to Montague at his instance and request ( which is also alleged in the answer ) ; that the reason he had it conveyed, by Eakin to Montague, was, that Montague had promised that he would take a part of the land, when he, Sappington, bought it.

That he resigned because he was behind in his accounts, and could not make up the amount of his shortage, and the people wanted a new treasurer.

That there was no writing, or other evidence between him and Montague of any understanding, or of their respective rights in the premises; that his and Frank's joint note of $3,000 was given to Cordell & Montague in lieu of his note to the bank for $3,000, on which I. N. Elzea was security; that he got his brother Frank to go on the note to release Elzea, and (referring to his testimony in the bill of exceptions shown him) that he supposed it was his testimony in that case, and that it was true, as stated in the bill of exceptions, that when his funds were counted in Cordell & Montague's bank, in 1873, he borrowed a sum of money from the bank to make up his shortage, and returned it to the bank, immediately after the counting; that the contract for a deed from Montague to Frank Sappington, and the deed of trust to Will H. Wood as trustee for Frank Sappington, were executed at Cordell & Montague's bank.

Frank Sappington testified to the same facts as Barney, with regard to their partnership, and the exchange of their stock for the land on Blackwater, etc., and also testified: That he learned of the purchase of the land in question by his brother Barney at the time it occurred; that, at the time the arrangement was entered into between him and Montague and Barney, he heard rumors of Barney's condition; that before he entered into that arrangement, he examined the records as to the title of the land in question, to ascertain whether he would be safe in entering into the arrangement, and found, as he supposed, that he would; that he did not make further inquiry, to inform himself when he heard the rumors about Barney's condition, because he thought it was none of his business, and he thought it was a delicate matter to be inquiring about another man's financial condition; that, when he found

that he would be safe, it was all that concerned him, and he did not care to inquire further; that, during the time to which the evidence relates, he, Frank Sappington, was the acting sheriff of Saline county, and in attendance on the courts as such; and that the papers in the suits of Saline county against Barney Sappington and his sureties on his official bonds as treasurer came into his hands for service, and were served by his deputy, as shown by the returns on them; that Barney, his brother, came to him to go on the note to the bank to release Elzea, and, after he had examined the records to see that he would be safe, he consented to do so; that the contract for a deed, from Montague to himself, and the deed of trust were executed at the bank of Cordell & Montague; that he was not present when it was done; and did not know that they were delivered to him before they were recorded; that Barney may have had them recorded and delivered them to him afterwards; that he made the payment on the note at the time indicated by the indorsement on it; that during the time from 1868 to 1874 he and Barney both lived in Marshall and often met; that he had knowledge of the pendency of the suits against Barney Sappington and his sureties when they were going on; that in the arrangement $1,500 was understood to be the price of the land; that he and his brother Barney both lived in Marshall and met frequently, during all the time to which the evidence relates; that he did not talk with Barney about his affairs; but he heard at the time of his resignation, that he was a defaulter to the county. And that on a recent sale of the other property conveyed in the deed of trust by which he was secured (Barney's homestead to Leverett Leonard) he, the witness, had reserved all of the amount paid by him on the note to the bank, over and above the $1,500 consideration, for the land in controversy.

E. D. Montague testified: That he may have told Sappington he would likely take a part of the land;

that Eakin probably made the deed to him at Sapping-ton's request; that he never had any conversation with Eakin about it, nor any agreement with Sappington that it should be made; that he did not know when the deed was made and does not know that it was ever delivered to him; that it was probably put on record without being delivered to him.

J. H. Cordell's testimony showed that the note for $3,000 was given by Barney and Frank Sappington, wholly in lieu of the note of $3,000, on which Elzea was surety; and that the balance for which the original note was given began about September or October, 1873; and that when the note was given the balance amounted to over $3,000, and Barney Sappington then paid the excess over $3,000, and gave the note for the remainder.   He knew nothing of the consideration of the land being embraced in, or in any way connected with, the note, and expressed surprise at the mention of such a claim.

The evidence further shows :   That about the tenth of December, 1873, Barney and Frank Sappington and E. D. Montague and the firm of Cordell & Montague, entered into the arrangement mentioned in the testi-mony, whereby Barney and Frank Sappington executed to the firm of Cordell & Montague their joint promis-sory note for the sum of $3,000, in lieu of the note for the same amount then held by Cordell & Montàgue against Barney Sappington as principal and I. N. Elzea as his surety; and Barney Sappington, by his deed of trust, conveyed to Will H. Wood, as trustee, the south-west quarter of southwest quarter of southeast quarter of the same section adjoining the land in question, and on which he had a dwelling-house in which he lived, in trust to secure Frank Sappington against his liability as his surety on said note, stipulating in said deed that said note, interest and costs were to be paid by said Barnabas Sappington, and if they were not paid by him that said conveyed land should be sold and the proceeds applied to the payment of the same; said note being

dated the tenth of December, 1873, and said deed of trust being dated the eleventh of the same month and recorded on the same day.

There were three suits brought by Saline county against Barnabas Sappington and his sureties. One was commenced January 23, 1874, and was served January 27, 1874, by Frank Sappington, sheriff, by Soper, deputy. Another filed February 20, 1875, and another filed August 9, 1875. Frederick M. Fulkerson was a defendant in two of said suits. The county recovered judgment in all of the suits, and the sureties paid all three.

*G. L. Hays* and *A. M. Hough* for appellants.

The transfer from Montague to Frank Sappington, had the effect to vest the legal title in Frank Sappington, the equitable title being in Barney Sappington, for the benefit of Saline county, for the following reasons: (1) It was made at the instance and for the benefit of Barney Sappington, the equitable owner of the land, with the intent, on the part of Barney Sappington, to hinder, delay and defraud his creditors; and that Frank Sappington had notice of, if he did not participate in, such fraudulent design of Barney Sappington. *Craig v. Zimmerman*, 87 Mo. 475; *Henderson v. Henderson*, 55 Mo. 534; *Ryland v. Collier*, 54 Mo. 513; R. S., sec. 2497. (2) It was voluntary and without consideration, and Barney Sappington was at the time insolvent. *Lionberger v. Baker*, 88 Mo. 447; *Patten v. Casey*, 57 Mo. 118; *Bohanon v. Combs*, 79 Mo. 305; *Lillard v. Shannon*, 60 Mo. 522; *State v. Kountz*, 83 Mo. 323. (3) It was a secret trust for the benefit of Barney Sappington. *State v. Jacobs*, 2 Mo. App. 183. The land was acquired and paid for by Barney Sappington, by an unlawful and fraudulent conversion of funds belonging to Saline county which were in his hands as treasurer of said county; and the

legal title placed in James H. Eakin, and by him conveyed to Montague and by Montague to Frank Sappington, with the purpose, on the part of Barney Sappington, of fraudulently concealing his interest 'in the [land, and of keeping the land out of reach of the county; and also of concealing his unlawful conversion of the money of the county paid for it; and Frank Sappington had notice of these facts or such knowledge as to put him on inquiry. Authorities cited in argument.

*Samuel Boyd* and *F. P. Sebree* for respondents.

(1) The evidence entirely fails to support the charges of the petition. In this, *first*, it fails to show any fraudulent intent in any of the persons named, or in the transactions named or referred to. *Second.* It fails to show any act of defendant, Frank Sappington, by which plaintiffs or any other person was either defrauded or damaged. *Third.* It fails to show any damage suffered by plaintiffs or their ancestor, or by Saline county, by any transaction concerning the land in suit. (2) The evidence shows an honest debt due Cordell & Montague from B. Sappington in December, 1873, and Sappington had the right to 'secure it in preference. *Henderson v. Henderson*, 55 Mo. 534; *Shelley v. Booth*, 73 Mo. 74; *Singer v. Goldenberg*, 17 Mo. App. 549; *Colbern v. Robinson*, 80 Mo. 541. Even if in insolvent circumstances, B. Sappington had the right to sell his property at a fair price to secure an honest debt. *Dougherty v. Cooper*, 77 Mo. 528. The evidence shows no fraudulent intent on the part of Frank Sappington, and the finding was for the right party. *Boyles v. Kepler*, 79 Mo. 558. The bond for title and deed from Montague to Frank Sappington was for a valuable consideration, and not a mere voluntary deed. See Tiedeman, Real Estate, sec. 802. (3) There is no pretense that the evidence shows that Frank Sappington had any knowledge or information of any transactions between Eakin and Barney Sappington, or

between Cordell & Montague and Barney Sappington, or between Barney Sappington and Montague, except what the records show. The evidence does show that Frank Sappington purchased the land in suit in good faith at a fair value, and that the purchase money was fully paid by him and applied to the payment of an honest debt of B. Sappington, and his purchase cannot equitably be disturbed. *Craig v. Zimmerman*, 87 Mo. 475; *Wineland v. Coonce*, 5 Mo. 296; *Hewe v. Waysman*, 12 Mo. 169; *Dougherty v. Cooper*, 77 Mo. 528; *Formler v. Moore*, 77 Mo. 651; *Shelley v. Booth*, 73 Mo. 75; *Ryan v. Young*, 79 Mo. 30; *Fury v. Kempin*, 79 Mo. 477; *Funkhouser v. Lay*, 78 Mo. 548. (4) The claim that plaintiffs are in pursuit of " trust fund," and the authorities cited by appellant, have no application under the facts as shown by the evidence in this case. If any "trust fund" has to do with this case at all, it was converted more than ten years before the institution of this suit. *Rogers v. Brown*, 61 Mo. 187; *Nelson v. Brodhack*, 44 Mo. 596; *Page v. Dixon*, 59 Mo. 47.

GANTT, P. J.—This is a suit in equity to obtain a decree of title to a tract of land, containing about ten acres, near Marshall, Saline county, Missouri. The plaintiffs are the heirs at law of Frederick Fulkerson, deceased, and the defendants are Barnabas Sappington and the heirs at law of Frank Sappington, who has died since this cause was submitted.

From 1868 to 1874, Barnabas Sappington was treasurer of Saline county. He was a man of small means. As treasurer he kept his account with the banking house of Cordell & Montague. In 1871, Barnabas Sappington bought of John W. Bryant the lands in suit, and in payment therefor gave a check on Cordell & Montague for $2,100. He caused Bryant to convey the land to one J. H. Eakin. Eakin held the land in this secret trust from September, 1871, until February

12, 1873, when, at the request of Barnabas Sappington, he conveyed it to E. D. Montague. Montague also held it in secret trust. He gave nothing for the land, nor was there any written evidence of how he held it.

In the fall of 1873, Barnabas Sappington became and was wholly insolvent. His financial condition became known, and, in obedience to public demand, he resigned his office of treasurer on December 23, 1873. At the time of his resignation he was indebted to Saline county and its different funds to the amount of $6,000. In October or November, he made a note to Cordell & Montague for $3,000, with Isaac N. Elzea as security.

When Elzea learned in December, that Barnabas was about to default, he demanded to be released from the note. Barnabas then applied to his brother, Frank Sappington, to go on this note as surety instead of Elzea. Frank Sappington, in his answer, alleged that Elzea insisted on being released as surety, and makes the very peculiar allegation "*that said Montague was not able to pay the same,*" and proceeds to set up *that for the purpose of securing Cordell & Montague and releasing* Elzea, he, Frank, as surety, signed a new note to Cordell & Montague for $3,000, payable three years after date, and bearing date December 10, 1873. On the eleventh of December, Barnabas Sappington executed a deed of trust, whereby he conveyed his homestead of nine and one-half acres near Marshall, to save Frank Sappington from loss by reason of his suretyship on said note to Montague and Cordell.

Frank Sappington testified as to his becoming a party to the note as follows: "At the time the arrangement was entered into between myself, Montague and Barney, *I heard rumors of Barney's condition.* Before signing the note in Elzea's stead, I examined the records to see the condition of the title to the land in suit, to ascertain whether I would be safe, and found, as I supposed, that I would be;" that he did not make further inquiry, when he heard rumors of

Barney's condition, because he thought it was none of his business; that it was a *delicate matter* to be inquiring into another man's financial condition; that Barney, his brother, came to him to go on the note to *release Elzea*, and after examining the title he consented to do so; that he was not present when Montague executed the written contract of sale from Montague to him; did not know that they were delivered to him before it was recorded; that Barney might have had that and the deed of trust securing the note recorded and delivered to him afterwards; that he knew early in January, 1874, of Barney's default; that he paid the note as the indorsements appeared on it as follows: $300 April 19, 1875; $1,442.44, December 10, 1875; the remainder in small payments from May 23, 1876 to December 24, 1878; that in a recent sale of Barney's homestead to Leverett Leonard he had reserved all of the amount paid by him on the note to Cordell & Montague, over and above the $1,500 consideration for the land in controversy.

Barnabas was a witness, in behalf of Frank and himself. He does not explain in his testimony how Montague came to make this contract with Frank in his absence. He does not inform us whether he consented to that contract or not. He does not explain how it was, that he still remained liable on the $3,000 note to Cordell & Montague and kept his own home mortgaged for its payment, whereas, if the sale to Frank was *bona fide*, Frank owed half of that sum himself to Cordell & Montague.

Cordell & Montague were witnesses also, but they cannot explain this. Indeed, Cordell was astonished to learn that it was claimed that Frank's contract for the land had anything to do with this note. He disclaimed it.

Frederick Fulkerson who was one of Barnabas Sappington's sureties on his official bonds, and who was sued for his defalcation, bought the land in suit at the

execution sale under the judgment in favor of Saline county against Barnabas and his sureties. His deed is dated June 15, 1878. E. D. Montague conveyed the land to Frank Sappington on March 6, 1879.

The circuit court found for the defendant and dismissed plaintiffs' bill, and from that decree they appeal to this court.

The purchase of this land by Barnabas Sappington, and his ownership of it, from the beginning to the end, have all the badges of fraud. It was paid for by an illegal use of the county's funds in his hands as treasurer. The title was taken in Eakin on the flimsy pretense that he did this because he could buy it cheaper in this way; but why keep it in Eakin's name, after the occasion for so doing ceased?

But the secret trust did not end with Eakin. After keeping it in Eakin's name from September 30, 1871, to February 12, 1873, without consulting Montague, he caused Eakin to convey it to Montague. It remained covered up in Montague's hands, until the public clamor demanded his resignation as treasurer. Knowing that he was a defaulter to the amount of $6,000, he did not convey this land to his sureties, who must make good his default, but he voluntarily, and in the absence of Frank Sappington, had Montague make out and acknowledge the contract of sale to Frank Sappington. This so-called contract smacks strongly of fraud throughout. There is no colloquium as to the value of the land. No agreement by Frank to pay $1,500 for it; not a word as to how this sale came to be made.

The giving of three years' time to a hopelessly insolvent man was itself a badge of fraud. But more than this, if Frank Sappington bought this land that day and the consideration is a part of the note, why is Barney Sappington still securing Frank for $3,000, and why is Barney taking the money that he owed the county and his sureties, and paying interest on Frank's half of $3,000? Why swell the amount of his indebtedness?

But this contract stands upon this paper writing alone. An instrument executed voluntarily by an insolvent debtor and placed upon the records of the county to mislead, hinder and delay his creditors. It requires too much credulity to believe, that Frank Sappington, living in the same county seat, having an office in the same courthouse, bearing the relation of brother to Barnabas Sappington, did not know the purpose of this secret trust. According to his own testimony he *heard rumors,* and then deliberately closed his ears.

Frank knew this land was held in secret trust; he knew of Barney's embarrassment; the law stamped Barney's transactions in this land in his financial condition fraudulent as to his creditors, and Frank had such notice in equity and good conscience that he and his heirs cannot be permitted to hold this land exempt from the claim of his creditors and especially of the sureties who have been compelled to make good the very money that went into this land.

As much as we are disposed to defer to the judgment of the trial court in equity cases, we are not able to affirm the judgment in this cause. The facts are so clear that we must draw our own conclusions, and we feel compelled under the evidence in this cause to decide that the contract made and entered into by E. D. Montague, December 10, 1873, and subsequently ripening into the deed of March 6, 1879, from Montague to Frank Sappington was made with the intent to hinder and delay the creditors of Barnabas Sappington; that the sheriff's deed to Frederick Fulkerson conveyed the equitable interest of Barney Sappington, to whose use Montague held said land, and that respondents as the heirs of Frank Sappington hold this land in trust for the appellants; and, so holding, a decree will be entered divesting the title of respondents and vesting it in appellants. All the judges of this division concur.